## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

HOMEVESTORS OF AMERICA, INC.,

      Plaintiff,

    v.

WARNER BROS. DISCOVERY, INC.,

      Defendant.

Civil Action No. 22-1583-RGA

---

### MEMORANDUM OPINION

Kelly E. Farnan, Christine Dealy Haynes, RICHARDS, LAYTON & FINGER, P.A., Wilmington, DE; Dina W. McKenney, Justin S. Cohen, HOLLAND & KNIGHT LLP, Dallas, TX, Cynthia A. Gierhart, HOLLAND & KNIGHT LLP, Washington, D.C.,

    Attorneys for Plaintiff.

Jennifer Ying, Michael J. Flynn, MORRIS, NICHOLS, ARSHT & TUNNELL LLP, Wilmington, DE; Aaron J. Moss, Joshua Geller, Hannah G. Shepherd, GREENBERG GLUSKER FIELDS CLAMAN & MACHTINGER LLP, Los Angeles, CA,

    Attorneys for Defendant.

August ___, 2025

ANDREWS, U.S. DISTRICT JUDGE:

Before me are Plaintiff's Motion for Summary Judgment (D.I. 197), Plaintiff's *Daubert* Motion to Exclude the Testimony of Edward Sabin (D.I. 199), and Defendant's Motion for Summary Judgment and to Exclude Plaintiff's Expert Opinions (D.I. 198). For the reasons that follow, Plaintiff's summary judgment motion is GRANTED IN PART AND DENIED IN PART; Plaintiff's *Daubert* motion is DENIED; and Defendant's motion is DENIED. The parties' *Daubert* motions are denied without prejudice.

## I.    BACKGROUND

HomeVestors of America ("HomeVestors") filed suit against Warner Bros. Discovery ("WBD") alleging trademark infringement and dilution.[1] (D.I. 1; D.I. 14). One of WBD's networks, HGTV, has a TV show titled *"Ugliest House in America"* ("*UHIA*" when referring to the show rather than its title). (D.I. 1 at 1). HomeVestors accuses WBD of infringing the following trademarks: THE UGLIEST HOUSE OF THE YEAR (U.S. Reg. Nos. 5,304,576 and 5,304,577), WE BUY UGLY HOUSES (U.S. Reg. Nos. 2,999,705 and 3,099,814), and UGLY HOUSE? (U.S. Reg. No. 5,172,916) (collectively, "the Marks"). (D.I. 203 at 3; *see* D.I. 14, Ex. B). HomeVestors has used the mark THE UGLIEST HOUSE OF THE YEAR in connection with a yearly home renovation contest for its franchisees since 2007. (D.I. 14 ¶ 9). Trial is scheduled to begin August 25. (D.I. 40).

Both parties have moved for summary judgment and to exclude the opposing party's expert testimony. (D.I. 197–199). The key disputes are as follows: (i) whether the standard set forth in *Rogers v. Grimaldi*, 875 F.2d 994 (2d Cir. 1989) applies, especially in light of the Supreme Court's

---

[1] Specifically, HomeVestors' counts include: (i–iii) trademark infringement, unfair competition, and dilution under the Lanham Act and (iv) injury to business reputation and dilution under Delaware law. (D.I. 14 ¶¶ 73–93).

recent decision in *Jack Daniel's Props., Inc. v. VIP Prods. LLC*, 599 U.S. 140, 143 (2023); (ii) whether HomeVestors' claims are barred by classic fair use; (iii) whether there is likelihood of confusion; (iv) whether HomeVestors can establish dilution by blurring; (v) whether HomeVestors is entitled to disgorgement; (vi) whether WBD's "innocent intent," "trademark misuse," and "unclean hands" defenses fail as a matter of law; and (vii) whether to exclude either parties' expert opinions.[2]

## II.    LEGAL STANDARD

### A. Summary Judgment

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).    The moving party has the initial burden of proving the absence of a genuinely disputed material fact relative to the claims in question.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 330 (1986).  Material facts are those "that could affect the outcome" of the proceeding.  *Lamont v. New Jersey*, 637 F.3d 177, 181 (3d Cir. 2011) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  "[A] dispute about a material fact is 'genuine' if the evidence is sufficient to permit a reasonable jury to return a verdict for the nonmoving party."  *Id.*  The burden on the moving party may be discharged by pointing out to the district court that there is an absence of evidence supporting the non-moving party's case.  *Celotex*, 477 U.S. at 323.

The burden then shifts to the non-movant to demonstrate the existence of a genuine issue for trial.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986); *Williams v. Borough of West Chester*, 891 F.2d 458, 460–61 (3d Cir. 1989).  A non-moving party

---

[2] HomeVestors moved for summary judgment on WBD's Seventh Defense of waiver and estoppel. (D.I. 203 at 13–14).  WBD dropped that defense.  (D.I. 221 at 3 n.1).

3

asserting that a fact is genuinely disputed must support such an assertion by: "(A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . ., admissions, interrogatory answers, or other materials; or (B) showing that the materials cited [by the opposing party] do not establish the absence . . . of a genuine dispute . . . ." Fed. R. Civ. P. 56(c)(1). The non-moving party's evidence "must amount to more than a scintilla, but may amount to less (in the evaluation of the court) than a preponderance." *Williams*, 891 F.2d at 460–61.

When determining whether a genuine issue of material fact exists, the court must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *Scott v. Harris*, 550 U.S. 372, 380 (2007); *Wishkin v. Potter*, 476 F.3d 180, 184 (3d Cir. 2007). If the non-moving party fails to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof, the moving party is entitled to judgment as a matter of law. *See Celotex*, 477 U.S. at 322.

**B.  *Daubert***

Federal Rule of Evidence 702 sets out the requirements for expert witness testimony and states:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

Fed. R. Evid. 702. The Third Circuit has explained:

> Rule 702 embodies a trilogy of restrictions on expert testimony: qualification, reliability and fit. Qualification refers to the requirement that the witness possess specialized expertise. We have interpreted this requirement liberally, holding that

"a broad range of knowledge, skills, and training qualify an expert." Secondly, the testimony must be reliable; it "must be based on the 'methods and procedures of science' rather than on 'subjective belief or unsupported speculation'; the expert must have 'good grounds' for his o[r] her belief. In sum, *Daubert* holds that an inquiry into the reliability of scientific evidence under Rule 702 requires a determination as to its scientific validity." Finally, Rule 702 requires that the expert testimony must fit the issues in the case. In other words, the expert's testimony must be relevant for the purposes of the case and must assist the trier of fact. The Supreme Court explained in *Daubert* that "Rule 702's 'helpfulness' standard requires a valid scientific connection to the pertinent inquiry as a precondition to admissibility."

By means of a so-called "*Daubert* hearing," the district court acts as a gatekeeper, preventing opinion testimony that does not meet the requirements of qualification, reliability and fit from reaching the jury. *See Daubert* ("Faced with a proffer of expert scientific testimony, then, the trial judge must determine at the outset, pursuant to Rule 104(a) [of the Federal Rules of Evidence] whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue.").

*Schneider ex rel. Estate of Schneider v. Fried*, 320 F.3d 396, 404–05 (3d Cir. 2003) (footnote and internal citations omitted).[3]

## III.    DISCUSSION

### A.  Both Parties' Summary Judgment Motions Are Denied With Respect to *Rogers*.

WBD argues that I should grant summary judgment barring HomeVestors' claims under *Rogers*. (D.I. 200 at 8–13). HomeVestors argues that I should grant summary judgment dismissing WBD's First and Second Defenses (D.I. 34 at 12) relying on the First Amendment and *Rogers* (D.I. 203 at 5–10).[4]  I find neither argument persuasive.

---

[3] The Court of Appeals wrote under an earlier version of Rule 702. Subsequent amendments do not alter the applicability of the quoted discussion.

[4] HomeVestors treats WBD's First and Second Defenses as both relying on *Rogers* (D.I. 203 at 5), which is appropriate because *Rogers* interprets the First Amendment. *Rogers*, 875 F.2d at 999. WBD briefly argues that even absent *Rogers*, "the First Amendment [p]recludes a [f]inding of [c]onsumer [c]onfusion." (D.I. 200 at 13). I find, however, that there exists a genuine dispute of material fact with respect to the likelihood of consumer confusion. *See infra* Section III.E.

*Rogers* is a Second Circuit case stating the principle that the First Amendment protects the use of marks in "expressive works" from trademark claims unless the challenged use of the mark "has no artistic relevance to the underlying work" or "explicitly misleads as to the source of the content of the work." 875 F.2d at 999. In *Jack Daniel's*, the Supreme Court held, without affirming the merits of the *Rogers* test, that the test does not apply when a mark is used "as a designation of source for the infringer's own goods." 599 U.S. at 153. Instead, *Rogers* only applies "to cases involving 'non-trademark uses'—or otherwise said, cases in which the defendant has used the mark at issue in a 'non-source-identifying way.'" *Id.* at 155–56 (citation omitted).[5]

The parties' dispute therefore focuses on whether WBD's use of *Ugliest House in America* is source-identifying. HomeVestors argues that *Ugliest House in America* must be source-identifying because it is the title of a television series (D.I. 203 at 6), because WBD and its production company have characterized it as source-identifying in contracts with each other and with the host of the show (*id.* at 6–8), and because the titles of many of WBD's other television shows are registered trademarks (*id.* at 8–9). WBD responds that none of those things are legally relevant (D.I. 221 at 7–10), and that it has presented unrebutted evidence—survey data—indicating that the public does not associate *Ugliest House in America* with HGTV or WBD (*id.* at 4–7).

Because there is enough evidence in the record to find a genuine factual dispute over whether WBD's use of the Marks is source-identifying, I consider neither party's argument for summary judgment persuasive.

---

[5] HomeVestors notes that the Third Circuit has never explicitly adopted *Rogers*. (D.I. 223 at 2). The Third Circuit has, however, summarily affirmed at least one case in which a lower court applied *Rogers*. *See Seale v. Grammercy Pictures, Inc.*, 156 F.3d 1225 (3d Cir. 1998) (affirming *Seale v. Gramercy Pictures*, 949 F. Supp. 331 (E.D. Pa. 1996) without opinion).

To start, WBD has not affirmatively demonstrated that *Ugliest House in America* is not source-identifying. Magistrate Judge Hatcher's Report and Recommendation (D.I. 29) denying WBD's motion to dismiss (D.I. 15), which I adopted (D.I. 32), outlined some of the facts that could lead a reasonable jury to conclude that WBD's use of the Marks is source-identifying:

> HomeVestors argues that it sufficiently pled facts in its First Amended Complaint that, if taken as true, could plausibly allow the Court to infer that WBD's use of HomeVestors' mark was source-identifying. I agree. Specifically, HomeVestors alleges that the marks are similar, that both parties run a contest related to ugliest homes, that internet searches for HomeVestors' marks return results for WBD's show, that promotional materials for the show emphasize the words in common with HomeVestors' marks, that WBD, either itself or through its agent, initially sought to take advantage of consumer recognition of HomeVestors' brand for casting purposes, and that WBD is actively competing with HomeVestors franchisees for houses and homeowners.

(D.I. 29 at 9) (citations omitted). As HomeVestors' briefing on likelihood of confusion indicates, each of these issues remains live. HomeVestors still alleges, with citations to the record, that the marks are similar (D.I. 223 at 10–14), that both parties run a contest related to ugliest homes (*id.* at 14–16), that internet searches for HomeVestors' marks return results for WBD's show (*id.* at 28), that promotional materials for the show emphasize the words in common with HomeVestors' marks (*id.* at 10–12), that WBD sought to take advantage of consumer recognition for HomeVestors' brand for casting purposes (*id.* at 8), and that WBD is competing with HomeVestors franchisees for houses and homeowners (*id.* at 14–16). Granting WBD's summary judgment motion would therefore be inappropriate.

On the other hand, none of the above indicates that *Ugliest House in America* must be source-identifying as a matter of law, either. Where, as here, a program's title plainly describes its subject matter, a reasonable fact-finder could conclude that the title is not source-identifying. *See, e.g., Down to Earth Organics, LLC v. Efron*, 2024 WL 1376532, at *4 (S.D.N.Y. Mar. 31, 2024) (concluding at the pleading stage that the program title "Down to Earth with Zac Efron"

merely "identif[ied] the subject matter and tone of the [s]eries" and was therefore subject to the *Rogers* test). WBD has also offered evidence that WBD chose the title *Ugliest House in America* solely for its descriptive value. (D.I. 200 at 11). Finally, WBD offers survey evidence suggesting that "consumers do not associate the title '*Ugliest House in America*' with a specific source." (*Id.* at 12).[6] HomeVestors is therefore not entitled to summary judgment on this issue either.

### B. Both Parties' Summary Judgment Motions Are Denied With Respect to Fair Use.

WBD asserts fair use as its Third Defense. (D.I. 34 at 12). WBD argues that classic fair use "is a complete defense to each of HomeVestors' claims." (D.I. 200 at 15). HomeVestors argues that WBD's fair-use defense fails as a matter of law. (D.I. 203 at 10). Both move for summary judgment. I deny both motions.

Classic fair use applies as a defense to trademark infringement when a defendant uses the term (1) "merely to describe [its] product;" (2) not as a trademark; and (3) in good faith. *Inst. for Sci. Info., Inc. v. Gordon & Breach, Sci. Publishers, Inc.*, 931 F.2d 1002, 1008 (3d Cir. 1991). Here, for the reasons discussed above, there exists a genuine dispute as to whether WBD uses *Ugliest House in America* as a trademark. Therefore, both parties' motions for summary judgment on WBD's Third Defense are denied.

### C. HomeVestors' Summary Judgment Motion Is Moot With Respect to "Innocent Intent."

WBD's Fourth Defense is innocent intent. (D.I. 34 at 12). HomeVestors seeks summary judgment declaring that innocent intent is not an affirmative defense to trademark infringement, though HomeVestors acknowledges that innocent intent may be relevant for determining damages.

---

[6] I agree with HomeVestors (D.I. 223 at 5–6) that the survey cannot, on its own, entitle WBD to summary judgment. It is, however, evidence in support of WBD's position.

(D.I. 203 at 11). WBD responds that it is offering innocent intent for its relevance to damages, not as an affirmative defense to trademark infringement. (D.I. 221 at 11–12). Because there is no real dispute here, HomeVestors' motion is dismissed as moot.

### D. HomeVestors' Summary Judgment Motion Is Granted With Respect to "Trademark Misuse" and "Unclean Hands."

HomeVestors argues that WBD's Fifth Defense of "trademark misuse" (D.I. 34 at 12) and Eighth Defense of "unclean hands" (*id.* at 13) fail as a matter of law (D.I. 203 at 11–13). These are the same defense, which I will refer to as "unclean hands." *See Jackpocket, Inc. v. Lottomatrix NY LLC*, 645 F. Supp. 3d 185, 276 (S.D.N.Y. 2022), *aff'd*, 2024 WL 1152520 (2d Cir. Mar. 18, 2024). WBD responds, "HomeVestors is not using its marks to prevent consumer confusion, but rather to monopolize common, descriptive terms—'ugly' and 'house'—that WBD uses solely in the title of an expressive work protected by the First Amendment." (D.I. 221 at 13).[7] I agree with HomeVestors.[8]

*Kars 4 Kids Inc. v. Am. Can!*, 98 F.4th 436, 449–50 (3d Cir. 2024) (citations omitted and cleaned up), states the relevant legal standard:

> The equitable doctrine of unclean hands applies when a party seeking relief has committed an unconscionable act immediately related to the equity the party seeks in respect to the litigation. [The Third Circuit] has required clear, convincing

---

[7] I do not understand WBD to be arguing for purposes of summary judgment that the trademarks are unenforceable due to being (i) descriptive and lacking secondary meaning or (ii) generic. *See Engage Healthcare Commc'ns, L.L.C. v. Intellisphere, L.L.C.*, 792 F. App'x 178, 183 (3d Cir. 2019) ("In order to qualify for Lanham Act protection, a mark must either be suggestive, arbitrary, or fanciful, or must be descriptive with a demonstration of secondary meaning. . . . Generic marks receive no protection; indeed, they are not 'trademarks' at all.") (citations omitted).

[8] The parties dispute whether WBD's interrogatory responses limited it to an antitrust theory of unclean hands. (D.I. 221 at 12–15; D.I. 244 at 9–11). This dispute does not change my analysis, as the principal case on which WBD relies, *Zurco, Inc. v. Sloan Valve Co.*, 785 F. Supp. 2d 476, 501 (W.D. Pa. 2011), itself concerned an antitrust theory of unclean hands. I also find that WBD's theory of unclean hands fails regardless.

evidence of egregious misconduct before invoking the doctrine of unclean hands. The misconduct must be rooted in fraud, unconscionable conduct, or bad faith . . . that injures the other party and affects the balance of equities.

Here, WBD argues that it may avail itself of the unclean hands defense because HomeVestors is attempting to monopolize common, descriptive terms used in the title of an expressive work. (D.I. 221 at 13). I am not persuaded. The argument that WBD's use of the title *Ugliest House in America* is protected by the First Amendment merely repackages WBD's *Rogers* argument, and, while suggesting that HomeVestors had improper motivations in suing, fails to point to any "unconscionable act" that WBD can reasonably argue has caused it any injury. The only conduct to which WBD points is HomeVestors' tendency for litigation. (D.I. 221 at 14). Generally, however, "[t]he allegedly unfair or improper filing of a trademark infringement lawsuit cannot itself constitute a basis for an unclean hands defense to that lawsuit" because a lawsuit enforcing a trademark is unrelated to the acquisition and use of the trademark itself. 4 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 31:51 (5th ed. 2025). Even if I found that this case was an exception to the rule, there would still need to be "clear, convincing evidence of egregious misconduct. . . ." *Kars 4 Kids*, 98 F.4th at 449–50. WBD has pointed to nothing in the record upon which a reasonable fact-finder could conclude that there was clear, convincing evidence of egregious misconduct such as fraud, unconscionable conduct, or bad faith.

WBD cites *Zurco, Inc. v. Sloan Valve Co.*, 785 F. Supp. 2d 476, 501 (W.D. Pa. 2011), in defense of its position. In that case, the plaintiff asserted a mark titled "THE PINT" against the defendant, and the defendant raised an unclean hands defense on the theory that the plaintiff was attempting to "impede the free descriptive use of 'pint' in order to wrongfully obtain a competitive advantage. . . ." *Id.* The plaintiff responded that "it [was] only attempt[ing] to prevent competitors from using the term 'pint' when such use infringe[d] upon [its] trademark, as opposed to when the

term [was] used merely to quantify a volume of water[,]" and sought summary judgment that the defendant's unclean hands defense was not supported by law. *Id.* Because the parties disagreed over "the extent to which [the plaintiff] ha[d] sought to prevent competitors from using the term 'pint' in a descriptive sense[,]" *id.*, the court denied summary judgment.

I do not find *Zurco* persuasive. First, the court in *Zurco* did not discuss the evidentiary support for the parties' dispute over "the extent to which Zurn has sought to prevent competitors from using the term 'pint' in a descriptive sense." *Id.* at 502. It is therefore impossible to say whether the record in that case resembles the record here.

Second, to the extent that the court in *Zurco* found that selective or aggressive trademark litigation can serve as the basis for an unclean hands defense, it would appear to be in contradiction with the weight of case law on this subject. *See, e.g., Sears, Roebuck & Co. v. Sears PLC*, 744 F. Supp. 1297, 1310 (D. Del. 1990) ("[T]he Court must focus on alleged inequitable conduct in the gaining or the use of the right being contested, not alleged inequitable conduct in the bringing of the lawsuit."); *Novadaq Techs., Inc. v. Karl Storz GmbH & Co.*., 143 F. Supp. 3d 947, 956 (N.D. Cal. 2015) ("[Conduct] relate[d] to the current litigation, not to how [the plaintiff] allegedly obtained the asserted trademark rights[,]" "cannot underlie an unclean hands defense. . . .") (citation omitted), *reconsidered on another issue*, 2015 WL 11110632 (N.D. Cal. Dec. 11, 2015); *Yurman Design, Inc. v. Golden Treasure Imports, Inc.*, 275 F. Supp. 2d 506, 518 (S.D.N.Y. 2003) ("The fact that a party has brought a lawsuit in which the party seeks protection for a trademark or trade dress, allegedly in bad faith, cannot be the basis of a defense of unclean hands, because the '[u]nclean hands must relate to the getting or using the alleged trademark rights.'") (quoting *Liz Claiborne, Inc. v. Mademoiselle Knitwear, Inc.*, 13 F. Supp. 2d 430, 445 (S.D.N.Y. 1998)). This motion is granted.

11

**E. WBD's Summary Judgment Motion Is Denied With Respect to Counts I and II.**

Counts I and II assert trademark infringement and unfair competition. (D.I. 14 ¶¶ 73–83). WBD argues that its use of *Ugliest House in America* presents no likelihood of confusion. (D.I. 200 at 16–33). I find that there exists a genuine dispute of material fact with respect to this issue.

To prevail on its claims for trademark infringement and unfair competition, HomeVestors must show (1) that it has a valid and legally protectable mark; (2) that it owns the mark; and (3) that WBD's use of the mark to identify goods or services creates a likelihood of confusion. *A & H Sportswear, Inc. v. Victoria's Secret Stores, Inc.*, 237 F.3d 198, 210–11 (3d Cir. 2000). WBD does not contest the first two elements (D.I. 223 at 8), so the only remaining point of contention is likelihood of confusion.

"In determining whether there is a likelihood of confusion, [the Third Circuit has] adopted a non-exhaustive list of factors, commonly referred to within [the Third Circuit] as the '*Lapp* factors. . . .'" *Arrowpoint Cap. Corp. v. Arrowpoint Asset Mgmt., LLC*, 793 F.3d 313, 319 (3d Cir. 2015) (quoting *Kos Pharms., Inc. v. Andrx Corp.*, 369 F.3d 700, 709 (3d Cir. 2004)).

> Because some of the *Lapp* factors as initially stated were not apposite for directly competing goods, [the Third Circuit] later adapted them to make them applicable whether the products directly compete or not. As adapted, the factors are as follows: (1) the degree of similarity between the owner's mark and the allegedly infringing mark; (2) the strength of the owner's mark; (3) the price of the goods and other factors indicating the care and attention one expects would be given when making a purchase; (4) the length of time the alleged infringer has used the mark without evidence of actual confusion arising; (5) the intent of the alleged infringer in adopting the mark; (6) the evidence of actual confusion; (7) whether the goods are marketed through the same channels; (8) the extent to which the target markets are the same; (9) the perceived relationship of the goods, whether because of their near-identity, similarity of function, or other factors; and (10) other facts suggesting that the prior owner might be expected to expand into the alleged infringer's market.

*Id.* (cleaned up). None of the factors are themselves "determinative and each must be 'weighed and balanced' based on the particular facts of the case." *Id.* (quoting *Kos*, 369 F.3d at 709). As a

general matter, ten-factor balancing tests are not particularly likely candidates for being able to grant summary judgment.

Here, each of the parties present arguments in support of their position with respect to each *Lapp* factor. (D.I. 200 at 16–33, D.I. 223 at 8–29, D.I. 242 at 6–18). At least three of HomeVestors' arguments convince me that there is a genuine dispute of material fact as to likelihood of confusion.[9]

First, HomeVestors argues that the marks are similar: "WBD emphasizes the UGLIEST HOUSE portion of the title of its television show and routinely uses only UGLIEST HOUSE in social media advertising. . . ." (D.I. 223 at 11). I agree with HomeVestors that WBD's emphasis of UGLIEST HOUSE creates a genuine dispute of material fact as to the marks' similarity.



(*Id.*) (Reg. No. 5,304,577, one of HomeVestors' design marks).

---

[9] These are examples. I express no opinion on the merits of HomeVestors' other arguments.



  

(*Id.*) (WBD advertisements). There is some visual similarity, including the emphasis on UGLIEST HOUSE. Because the first *Lapp* factor is the most important in the likelihood of confusion analysis, *see A & H Sportswear*, 237 F.3d at 216, this visual similarity counsels against ruling in favor of WBD on summary judgment.

Second, HomeVestors argues that there is evidence of actual confusion between the marks. (D.I. 223 at 24–26). In addition to other arguments on this point, HomeVestors states, "[T]he National Association of Realtors [] confused the names of WBD's show and HomeVestors' contest" (*id.* at 25) and that "one of HomeVestors' own marketing vendors confused the names of WBD's show and HomeVestors' contest" (*id.*). It is not clear that WBD responds to the vendor assertion; it responds to the National Association of Realtors assertion by arguing for a different interpretation of the evidence. (D.I. 242 at 14). This is clearly a genuine dispute of a material fact relating to the sixth *Lapp* factor.

Third, HomeVestors argues, "The evidence is disputed regarding WBD's intent in adopting the mark." (D.I. 223 at 21). Specifically, HomeVestors says, "WBD's predecessor entity

published an article on HGTV's website . . . discuss[ing] HomeVestors and its famous 'We Buy Ugly Houses' billboards[,]" and that "[i]n November 2020, the title clearance report provided by [the production company WBD hired] to WBD—before the show premiered—identifies HomeVestors UGLY HOUSES marks." (*Id.* at 7–8). That established "that WBD knew of HomeVestors and its marks before it began using its infringing mark." (*Id.* at 8). "The fact that [[the production company WBD hired] reached out to HomeVestors seeking a collaboration in which HomeVestors would send 'ugly' homes to WBD as prospective contestants for the show] shows that WBD chose the name UGLIEST HOUSE IN AMERICA knowing it would convey or suggest an actual affiliation with[] HomeVestors and its UGLY HOUSES marks." (*Id.*).

WBD responds that HomeVestors' evidence only proves that WBD was aware of HomeVestors' marks, which is legally insufficient. (D.I. 242 at 12–14). But the fact that WBD's agent sought to collaborate with HomeVestors, alongside the evidence that WBD knew of the marks before *UHIA* premiered, could plausibly suggest that WBD sought to trade on HomeVestors' goodwill. There is at least a genuine dispute of material fact about the fifth *Lapp* factor.

WBD's motion for summary judgment is denied with respect to likelihood of confusion.

### F. WBD's Summary Judgment Motion Is Denied With Respect to Counts III and IV.

Counts III and IV allege dilution of HomeVestors' marks. (D.I. 14 ¶¶ 84–93). WBD argues for summary judgment on the grounds that HomeVestors' marks are not distinctive and that HomeVestors cannot establish dilution by "blurring." (D.I. 200 at 34–35).

To establish a prima facie claim for dilution under the Lanham Act, HomeVestors must show that (1) its marks are "famous," (2) WBD is making commercial use of a mark in interstate commerce, (3) WBD's use began after HomeVestors' marks became famous, and (4) WBD's use

causes dilution by lessening the capacity of the HomeVestors' marks to identify and distinguish HomeVestors' goods or services. *Times Mirror Mags., Inc. v. Las Vegas Sports News, L.L.C.*, 212 F.3d 157, 163 (3d Cir. 2000). Delaware law differs from the Lanham Act in that it requires marks to be distinctive, rather than famous. *See S&P Glob. Inc. v. S&P Data LLC*, 619 F. Supp. 3d 445, 468 (D. Del. 2022).

Neither party briefs this issue independently from likelihood of confusion. WBD argues, "As discussed [in the section on likelihood of confusion], the marks are all highly descriptive, lack conceptual distinctiveness, and lack commercial recognition" for the reasons it outlined in its briefing on likelihood of confusion. (D.I. 200 at 34). HomeVestors argues, "The fact-intensive questions that preclude summary judgment on HomeVestors' trademark infringement claim also prevent summary judgment on the dilution claims." (D.I. 223 at 29). I therefore deny summary judgment on this issue, for the same reasons I denied summary judgment with respect to likelihood of confusion.

### G. WBD's Summary Judgment Motion Is Denied With Respect to Disgorgement.

The only financial remedy that HomeVestors seeks is disgorgement of WBD's profits from *UHIA*. (D.I. 202-3 at 173 of 246 (Interrogatory response)). WBD moves for summary judgment, arguing, "The undisputed facts establish that disgorgement would be inequitable. . . ." (D.I. 200 at 35–36). I find there is a genuine dispute of material fact.

To "evaluat[e] whether equity supports disgorging the infringer's profits," courts consider "(1) whether the [infringer] had the intent to confuse or deceive, (2) whether sales have been diverted, (3) the adequacy of other remedies, (4) any unreasonable delay by the plaintiff in asserting his rights, (5) the public interest in making the misconduct unprofitable, and (6) whether

16

it is a case of palming off." *Kars 4 Kids Inc. v. Am. Can!*, 8 F.4th 209, 223 (3d Cir. 2021) (quoting *Banjo Buddies, Inc. v. Renosky*, 399 F.3d 168, 175 (3d Cir. 2005)).

Here, there exists a genuine dispute of material fact with respect to at least the first and fourth factors. I discussed the first factor above. *See supra* Section III.E. Regarding the fourth factor, HomeVestors notes that it sent WBD a cease-and-desist letter roughly two weeks after WBD premiered *UHIA*, and that "[a]fter additional correspondence between the parties, HomeVestors filed suit later that same year." (D.I. 223 at 32). That does not sound like unreasonable delay. In light of parties' factual dispute, I deny WBD's summary judgment motion as it relates to disgorgement.

### H. Both Parties' *Daubert* Motions Are Denied Without Prejudice.

Both parties seek to exclude opposing expert testimony. (D.I. 200 at 38–50; D.I. 203 at 14–29).

I recently granted WBD's motion (D.I. 264) for a bench trial (D.I. 280). While I acknowledge the "gate-keeper" function of a federal trial judge, it is not so important that it be done pretrial when the trial is a bench trial. *See In re Salem*, 465 F.3d 767, 777 (7th Cir. 2006); *United States v. Brown*, 415 F.3d 1257, 1269–70 (11th Cir. 2005); *Sanofi-Aventis U.S. LLC v. Merck Sharp & Dohme Corp.*, 2018 WL 2422003, *2 (D. Del. May 29, 2018); *Sanofi v. Glenmark Pharms. Inc.*, 2016 WL 10957311, *1 (D. Del. May 12, 2016). I still must evaluate the admissibility of expert testimony in a bench trial, but there is more flexibility in how I do it. *See UGI Sunbury LLC v. A Permanent Easement for 1.7575 Acres*, 949 F.3d 825, 836 (3d Cir. 2020). Here, live testimony and cross-examination are much more likely to result in a correct decision from me about whether an expert is giving appropriate expert testimony. Thus, while I am denying the motions for now, the parties may make (and, indeed, in order to preserve the issue, must make)

objections at appropriate times. Failure to make a timely appropriate objection will result in the objection being waived. I will consider only evidence actually adduced at trial (whether through cross-examination or testimony from other witnesses) in ruling on any renewed motion.

I offer below my preliminary thoughts on the parties' *Daubert* motions.

Start with WBD's expert Mr. Sabin. (D.I. 203 at 16–21). I am skeptical that Mr. Sabin is qualified. I also have serious reservations concerning his methods.

With respect to qualifications, I note that Mr. Sabin has no background in accounting or valuation principles. (D.I. 204-1 at 175–77 of 222). While he has substantial experience in the television industry, it does not appear that any of that experience extends to finance. (*Id.*). While he may be qualified to opine on the general high-level operations or strategic decision-making of a television studio, I am skeptical that he is qualified to calculate specific revenue figures and to offer any specific commentary on other witnesses (for either party) who do offer specific calculations.

With respect to method, HomeVestors argues that, in concluding that WBD does not make a profit on *UHIA*, "Mr. Sabin reviewed [a 'made-for-litigation'] spreadsheet, spoke with [a corporate representative who explained the spreadsheet], and then provided his *ipse dixit* opinion that WBD has lost $22.3 million based on the numbers WBD provided in the spreadsheet." (D.I. 203 at 22). Because "[c]ourts can exclude expert testimony as unreliable when experts fail to conduct any independent analysis" (*id.* at 23), and for the additional reason that Mr. Sabin did not seem to know what all the numbers in the spreadsheet represented (D.I. 244 at 14–15), HomeVestors says I should exclude Mr. Sabin's report. It makes similar arguments with respect to other aspects of Mr. Sabin's report. (D.I. 203 at 23–25).

18

Rather than challenging HomeVestors' characterization of Mr. Sabin's analysis, WBD simply argues that the information HomeVestors alleges Mr. Sabin parrots is accurate and that he is entitled to rely on it.  (D.I. 221 at 22–25).  The information may or may not be accurate—that will be decided on the basis of testimony of other witnesses.  WBD's argument does not rebut HomeVestors' assertion that Mr. Sabin has failed to conduct his own, independent analysis.  *See, e.g.*, *Mercedes-Benz, U.S.A. LLC v. Coast Auto. Grp., Ltd.*, 2006 WL 2830962, at \*12 (D.N.J. Sept. 29, 2006) (rejecting damages expert's testimony because the expert "relied on factual assertions and assumptions provided by [a defendant] without doing any independent analysis and without providing a factual basis for his conclusion").  I am therefore skeptical that Mr. Sabin's approach survives *Daubert*.

Next, I address HomeVestors' experts, starting with Ms. Trexler, who calculated the revenue attributable to *UHIA*.  (D.I. 200 at 38).

With respect to qualifications, WBD's primary argument is that Ms. Trexler lacks experience in the television industry.  (*Id.* at 39).  I strongly doubt that is a legitimate basis on which to exclude her testimony.  As courts in this circuit have repeatedly ruled, a damages expert need not have specialized experience in the industry on which he or she is expressing an opinion in order to survive *Daubert*.  *See, e.g.*, *Floorgraphics, Inc. v. News Am. Mktg. In-Store Servs., Inc.*, 546 F. Supp. 2d 155, 167–68 (D.N.J. 2008); *Rhoads Indus., Inc. v. Shoreline Found., Inc.*, 2021 WL 2778562, at \*30 (E.D. Pa. July 2, 2021); *Rullo v. Univ. of Pittsburgh - of Commonwealth Sys. of Higher Educ.*, 2021 WL 640063, at \*3 (W.D. Pa. Feb. 18, 2021); *Main St. Mortg., Inc. v. Main St. Bancorp., Inc.*, 158 F. Supp. 2d 510, 513 (E.D. Pa. 2001).  Ms. Trexler can get the information she needs from other experts and discovery materials.  She need only be qualified to run the numbers, which she clearly is.

With respect to method, I believe that WBD's concerns are best addressed on cross-examination, rather than *Daubert*. WBD faults Ms. Trexler for failing to analyze "whether specific revenue streams can be attributed directly to *UHIA*" (D.I. 200 at 40), but given that WBD does not track the revenue specifically attributable to any particular program (D.I. 142 at 5:8–6:12), Ms. Trexler's pro rata approach based on overall HGTV revenue (D.I. 223 at 36) would at least seem to be an appropriate starting point.

WBD also criticizes Ms. Trexler's decision to use some data while ignoring other data. (D.I. 200 at 41–42). This decision can be addressed on cross-examination; it is not necessary or appropriate to use it as the grounds for exclusion under *Daubert*.

WBD seeks to exclude the testimony of Dr. Isaacson, who rebutted WBD's survey expert, on the grounds that his method is unreliable. (*Id.* at 44–48). First, WBD argues that Dr. Isaacson's testimony contradicts HomeVestors' position with respect to the distinctiveness of its marks. (*Id.* at 44–45). Even if that is true, it does not make his method unreliable. Second, WBD argues that Dr. Isaacson is contradicting his own past opinions, as well as various authoritative sources opining on the merits of the survey format—"Eveready"—that Ms. Butler used. (*Id.* at 45–46).[10] Prior inconsistent statements go to credibility and can be a good basis for cross-examination, but I do not see why it would render his opinion inadmissible. The assertion that Eveready surveys are generally accepted does not mean Dr. Isaacson should be barred from explaining their potential

---

[10] "[T]he *Ever-Ready* survey . . . involves showing consumers only the potentially-infringing product and asking open-ended questions to determine whether they believe the product is associated with the senior mark." *Parks LLC v. Tyson Foods, Inc*, 863 F.3d 220, 232–33 (3d Cir. 2017) (citing Jerre B. Swann, *Likelihood of Confusion Studies and the Straitened Scope of Squirt*, 98 Trademark Rep. 739, 746 (2008) (describing the Eveready format as the "gold standard" for likelihood of confusion surveys)).

20

downsides. The assertion that he is contradicting his stance from earlier cases is unremarkable as it says nothing about the merits of his current opinion. Third, WBD argues that Dr. Isaacson's self-initiated internet searches demonstrating the "marketplace proximity" theory do not replicate real-world conditions. (*Id.* at 46–47). Whether or not that is the case can be addressed at cross-examination. Fourth, WBD argues that Dr. Isaacson incorrectly characterizes Ms. Butler's survey as failing to test all of the marks at issue. (*Id.* at 48). I observe that Ms. Butler's surveys never specifically asked about the WE BUY UGLY HOUSES or UGLY HOUSE? marks. (D.I. 223 at 46). That may limit what she can say about those marks, but that is an issue that can be addressed during her testimony.

Finally, WBD argues that Mr. Sturrock is unqualified and offers irrelevant and unreliable opinions. (D.I. 200 at 48–50). The thrust of Mr. Sturrock's testimony is that the houses featured on *UHIA* would make for good HomeVestors purchases. Therefore, the parties compete, which goes to likelihood of confusion.[11] As a Development Agent for HomeVestors who "has reviewed at least 1,000 houses" (D.I. 223 at 48), he seems qualified to offer that opinion, even if it is of minimal probative value. There is nothing particularly objectionable about the method, either.

## IV.    CONCLUSION

An appropriate order will issue.

---

[11] WBD points out that the relevant question is whether the parties compete in the minds of the consumers. (D.I. 200 at 48–49). But whether the parties compete at all might be probative of whether they compete in the minds of consumers.