# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| HOMEVESTORS OF AMERICA, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 22-1583-RGA |
| | ) | |
| WARNER BROS. DISCOVERY, INC., | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## PLAINTIFF HOMEVESTORS OF AMERICA, INC.'S
## OPENING POST-TRIAL BRIEF

OF COUNSEL:

Justin S. Cohen
Justin.Cohen@hklaw.com
Dina W. McKenney
Dina.McKenney@hklaw.com
Morgan J. Delabar
Morgan.Delabar@hklaw.com
HOLLAND & KNIGHT LLP
One Arts Plaza
1722 Routh St., Suite 1500
Dallas, TX 75201
214-969-1700

Cynthia A. Gierhart
HOLLAND & KNIGHT LLP
Cindy.Gierhart@hklaw.com
800 17th Street NW, Suite 1100
Washington, DC 20006

Steven J. Fineman (#4025)
Kelly E. Farnan (#4395)
Christine D. Haynes (#4697)
Richards, Layton & Finger, P.A.
One Rodney Square
920 North King Street
Wilmington, DE 19801
(302) 651-7700
farnan@rlf.com
haynes@rlf.com

*Attorneys for Plaintiff*
*HomeVestors of America, Inc.*

## TABLE OF CONTENTS

ARGUMENT .................................................................................................................1

I.  WBD'S USE OF THE MARK UGLIEST HOUSE IN AMERICA CONSTITUTES
    TRADEMARK INFRINGEMENT AND UNFAIR COMPETITION. ...........................1

    A.  HomeVestors Proved a Likelihood of Confusion Between WBD's and
        HomeVestors' Marks. ..................................................................................2

II. WBD'S USE OF THE TITLE UGLIEST HOUSE IN AMERICA CONSTITUTES
    DILUTION UNDER FEDERAL AND DELAWARE LAW. ......................................19

    A.  HomeVestors' WE BUY UGLY HOUSES Marks Are Famous. .............................20

    B.  HomeVestors' WE BUY UGLY HOUSES Marks Are Distinctive. .........................21

    C.  WBD Is Likely to Cause Dilution of the WE BUY UGLY HOUSES Marks. ..........21

III. WBD CANNOT MEET ITS BURDEN TO ESTABLISH ANY OF ITS
     AFFIRMATIVE DEFENSES. .....................................................................23

IV. HOMEVESTORS IS ENTITLED TO A PERMANENT INJUNCTION AGAINST
    WBD'S USE OF THE TITLE UGLIEST HOUSE IN AMERICA. .............................24

V.  HOMEVESTORS IS ENTITLED TO DISGORGEMENT OF WBD'S PROFITS
    ATTRIBUTABLE TO THE SHOW UGLIEST HOUSE IN AMERICA. ....................25

    A.  Equitable Considerations Favor Disgorgement. ........................................25

    B.  HomeVestors Met Its Burden in Proving WBD's Revenue. ....................27

    C.  WBD Failed to Meet Its Burden in Proving Costs and Apportionment. ...................28

CONCLUSION...............................................................................................................30

i

## <u>TABLE OF AUTHORITIES</u>

**Cases**                                                                                                          **Page(s)**

*A & H Sportswear, Inc. v. Victoria's Secret Stores, Inc.*,
  237 F.3d 198 (3d Cir. 2000)..................................................................................... *passim*

*Alliance for Good Gov't v. Coal. for Better Gov't*,
  901 F.3d 498 (5th Cir. 2018) .............................................................................................8

*B. Braun Melsungen AG v. Terumo Med. Corp.*,
  778 F. Supp. 2d 506 (D. Del. 2011)..................................................................................25

*Banjo Buddies, Inc. v. Renosky*,
  399 F.3d 168 (3d Cir. 2005)........................................................................................26, 27

*Barnes Grp. Inc. v. Connell Ltd. P'ship*,
  793 F. Supp. 1277 (D. Del. 1992)...............................................................................19, 27

*Belmont v. MB Inv. Partners, Inc.*,
  708 F.3d 470 (3d Cir. 2013)..............................................................................................12

*Big M. Inc. v. U.S. Shoe Corp.*,
  228 U.S.P.Q. 614 (T.T.A.B. Dec. 13, 1985) .....................................................................6

*Blackman v. Hustler Mag., Inc.*,
  620 F. Supp. 792 (D.D.C. 1985), *aff'd in part, rev'd in part on other grounds*,
  800 F.2d 1160 (D.C. Cir. 1986) ..................................................................................29, 30

*Century 21 Real Est. Corp. v. Century Life of Am.*,
  970 F.2d 874 (Fed. Cir. 1992)........................................................................................4, 5

*Checkpoint Sys. Inc. v. Check Point Software Tech. Inc.*,
  269 F.3d 270 (3d Cir. 2001)........................................................................9, 16, 17, 18

*Com. Nat. Ins. Servs., Inc. v. Com. Ins. Agency, Inc.*,
  214 F.3d 432 (3d Cir. 2000)......................................................................................2, 3, 11

*Fisons Horticulture, Inc. v. Vigoro Indus., Inc.*,
  30 F.3d 466 (3d Cir. 1994).................................................................................................4

*Ford Motor Co. v. Summit Motor Prods., Inc.*,
  930 F.2d 277 (3d Cir. 1991)..............................................................................................21

*Freedom Card, Inc. v. JPMorgan Chase & Co.*,
  432 F.3d 463 (3d Cir. 2005).........................................................................................2, 6

*GOLO, LLC v. Goli Nutrition Inc.*,
  No. 20-667-RGA, 2020 WL 5203601 (D. Del. Sept. 1, 2020)..........................................18, 19

*Interpace Corp. v. Lapp, Inc.*,
  721 F.2d 460 (3d Cir. 1983).....................................................................................2, 7, 16, 25

*Kars 4 Kids Inc. v. Am. Can!*,
  8 F.4th 209 (3d Cir. 2021) .........................................................................................................26

*Kos Pharms., Inc. v. Andrx Corp.*,
  369 F.3d 700 (3d Cir. 2004).............................................................................................3, 11, 12

*Leonard v. Stemtech Int'l Inc.*,
  834 F.3d 376 (3d Cir. 2016)........................................................................................................29

*Lontex Corp. v. Nike, Inc.*,
  107 F.4th 139 (3d Cir. 2024) ......................................................................................................12

*Maya Swimwear, Corp. v. Maya Swimwear, LLC*,
  789 F. Supp. 2d 506 (D. Del. 2011)............................................................................................25

*PNC Fin. Servs. Grp., Inc. v. Plaid Inc.*,
  No. 2:20-cv-1977, 2024 WL 3691607 (W.D. Pa. Aug. 7, 2024)................................................28

*Presto Prods. Inc. v. Nice-Pak Prods. Inc.*,
  9 U.S.P.Q.2d 1895 (T.T.A.B. 1988) .............................................................................................4

*Rockland Mortg. Corp. v. S'holders Funding, Inc.*,
  835 F. Supp. 182 (D. Del. 1993)...................................................................................................4

*S&P Glob. Inc. v. S&P Data LLC*,
  619 F. Supp. 3d 445 (D. Del. 2022)................................................................................... *passim*

*Sabinsa Corp. v. Creative Compounds, LLC*,
  609 F.3d 175 (3d Cir. 2010).............................................................................................. *passim*

*Sanofi-Aventis v. Advancis Pharm. Corp.*,
  453 F. Supp. 2d 834 (D. Del. 2006)........................................................................................1, 3

*SurgiQuest v. Lexion Med., Inc.*,
  No. 14-382-GMS, 2018 WL 2247216 (D. Del. May 16, 2018) ..................................................27

*Times Mirror Mags., Inc. v. Las Vegas Sports News, L.L.C.*,
  212 F.3d 157 (3d Cir. 2000)..................................................................................................19, 21

*U.S. Jaycees v. Philadelphia Jaycees*,
  639 F.2d 134 (3d Cir. 1981)...........................................................................................................8

*UHS of Del., Inc. v. United Health Servs., Inc.*,
227 F. Supp. 3d 381 (M.D. Pa. 2016) ...................................................................21

*Walgreen Co. v. PWNHealth, LLC*,
No. CV 24-0356-RGA, 2025 WL 445349 (D. Del. Feb. 10, 2025) ........................30

**Statutes**

6 *Del. C.* § 3313 ....................................................................................................19

15 U.S.C. § 1065 ......................................................................................................8

15 U.S.C. § 1116(a) to add .......................................................................................25

15 U.S.C. § 1117(a) ...........................................................................................27, 28

Lanham Act Sections 32 and 43(a) ............................................................................1

Trademark Modernization Act, 15 U.S.C. § 1116(a) .................................................25

**Other Authorities**

Restatement Third Agency § 5.03 ............................................................................12

Plaintiff HomeVestors of America, Inc. ("HomeVestors") sued Defendant Warner Bros. Discovery, Inc. ("WBD") because WBD's use of the name UGLIEST HOUSE IN AMERICA for its HGTV television series featuring a home renovation contest is nearly identical to HomeVestors' registered marks for its home renovation contest THE UGLIEST HOUSE OF THE YEAR. WBD's series logo is also highly similar to HomeVestors' design mark, as shown below:

 

PPFF ¶ 9.[1]

During the bench trial held from August 25 through August 28, 2025, HomeVestors established that WBD's use of its series title is likely to cause both forward and reverse confusion with HomeVestors' THE UGLIEST HOUSE OF THE YEAR marks, dilution under federal and state law of HomeVestors' WE BUY UGLY HOUSES marks, and that HomeVestors is entitled to injunctive relief and a disgorgement of WBD's profits attributable to the show.

## ARGUMENT

### I.     WBD'S USE OF THE MARK UGLIEST HOUSE IN AMERICA CONSTITUTES TRADEMARK INFRINGEMENT AND UNFAIR COMPETITION.

To prove trademark infringement and unfair competition under Sections 32 and 43(a) of the Lanham Act, HomeVestors must show that it owns a valid mark and that WBD's use of the mark is likely to create confusion concerning the origin of its services. *Sanofi-Aventis v. Advancis*

---

[1] A detailed set of facts is provided in the accompanying Plaintiff's Proposed Findings of Fact ("PPFF") and are referenced herein where relevant.

*Pharm. Corp.*, 453 F. Supp. 2d 834, 847 n.2 (D. Del. 2006) (citing, *inter alia*, *Checkpoint Sys. Inc. v. Check Point Software Tech. Inc.*, 269 F.3d 270, 279 (3d Cir. 2001)). WBD does not contest that HomeVestors owns valid, incontestable trademark registrations for each of the asserted marks. D.I. 291-1 (Joint Uncontested Facts), ¶ 4. The remaining question for the Court is whether WBD's use of the mark is likely to cause confusion. HomeVestors established at trial that each of the *Lapp* factors favors HomeVestors, and WBD's use of the title UGLIEST HOUSE IN AMERICA constitutes trademark infringement of HomeVestors' THE UGLIEST HOUSE OF THE YEAR marks via forward and reverse confusion.

Reverse confusion occurs when a large company adopts the mark of a smaller senior user, and, because of the larger company's vast advertising reach and resources, consumers are likely to encounter the larger company's use of the mark first, despite it being the junior user. When consumers encounter the smaller company's mark, they may assume the smaller company is copying the larger company, even though the smaller company was the first to use the mark and is the rightful owner. *See Freedom Card, Inc. v. JPMorgan Chase & Co.*, 432 F.3d 463, 471 (3d Cir. 2005) ("Reverse confusion occurs when a larger, more powerful company uses the trademark of a smaller, less powerful senior owner and thereby causes likely confusion as to the source of the senior user's goods or services.") (citation omitted). The result of reverse confusion "is that the senior user [here, HomeVestors] loses the value of the trademark—its product identity, corporate identity, control over its goodwill and reputation, and ability to move into new markets." *Com. Nat. Ins. Servs., Inc. v. Com. Ins. Agency, Inc.*, 214 F.3d 432, 444 (3d Cir. 2000) (citation omitted).

### A.    HomeVestors Proved a Likelihood of Confusion Between WBD's and HomeVestors' Marks.

The Third Circuit assesses the likelihood of confusion using the following *Lapp* factors:

> (1) the degree of similarity between the owner's mark and the alleged infringing mark; (2) the strength of the owner's mark; (3) the price of the goods and other factors indicative of the care and attention expected of consumers when making a purchase; (4) the length of time the defendant has used the mark without evidence of actual confusion arising; (5) the intent of the defendant in adopting the mark; (6) the evidence of actual confusion; (7) whether the goods, competing or not competing, are marketed through the same channels of trade and advertised through the same media; (8) the extent to which the targets of the parties' sales efforts are the same; (9) the relationship of the goods in the minds of the consumers, whether because of the near-identity of the products, the similarity of function, or other factors; and (10) other facts suggesting that the consuming public might expect the prior owner to manufacture a product in the defendant's market, or expect a prior owner is likely to expand into the defendant's market.

*Sanofi-Aventis*, 453 F. Supp. 2d at 847-48 (citing, *inter alia*, *Interpace Corp. v. Lapp, Inc.*, 721 F.2d 460, 463 (3d Cir. 1983)). No single likelihood of confusion factor is determinative in the analysis, and each may be provided different weight depending upon the facts in question. *Kos Pharms., Inc. v. Andrx Corp.*, 369 F.3d 700, 709 (3d Cir. 2004). Moreover, the "confusion" to be tested is not merely confusion as to product or as to source, but rather any confusion about whether there is any association between the parties, their products or services. *Id.* at 711. In this case, confusion as to association is likely.

In the context of reverse confusion, certain factors "must be reworked." *Com. Nat. Ins. Servs., Inc.*, 214 F.3d at 444. With the second factor, "the lack of commercial strength of the smaller senior user's mark is to be given less weight . . . because it is the strength of the larger, junior user's mark which results in reverse confusion." *Id.* And "the intent inquiry [the fifth factor] must also be altered to focus on whether the defendant was aware of the senior user's use of the mark in question, or whether the defendant conducted an adequate name search for other companies marketing similar goods or services under that mark." *Id.*

   1. _Similarity Between the Marks_

"The single most important factor in determining likelihood of confusion is mark similarity." *A & H Sportswear, Inc. v. Victoria's Secret Stores, Inc.*, 237 F.3d 198, 216 (3d Cir.

2000). The two marks need not be identical; instead, courts often compare the dominant portion of the marks. *Fisons Horticulture, Inc. v. Vigoro Indus., Inc.*, 30 F.3d 466, 477 (3d Cir. 1994) ("[T]rademark infringement does not require exact copying of the trademark as the owner uses it."); *Rockland Mortg. Corp. v. S'holders Funding, Inc.*, 835 F. Supp. 182, 192 (D. Del. 1993) (finding Courts may properly "give greater force and effect" to the dominant feature of a mark) (citation omitted).

WBD's UGLIEST HOUSE IN AMERICA mark is nearly identical to HomeVestors' THE UGLIEST HOUSE OF THE YEAR marks, both in sight and sound. The Trademark Trial & Appeal Board and Federal Circuit have repeatedly found that the first words in a mark are often the ones most remembered by consumers and typically form the dominant portion of the mark. *See Presto Prods. Inc. v. Nice-Pak Prods. Inc.*, 9 U.S.P.Q.2d 1895 (T.T.A.B. 1988) ("[I]t is often the first part of a mark which is most likely to be impressed upon the mind of a purchaser and remembered"); *Palm Bay Imports, Inc. v. Veuve Clicquot Ponsardin Maison Fondee en 1772*, 396 F.3d 1369, 1372 (Fed. Cir. 2005) (finding VEUVE is "a 'prominent feature' as the first word in the mark and the first word to appear on the label"); *Century 21 Real Est. Corp. v. Century Life of Am.*, 970 F.2d 874, 876 (Fed. Cir. 1992) ("[U]pon encountering each mark, consumers [will] first notice [an] identical lead word").

The dominant portions of the UGLIEST HOUSE IN AMERICA and THE UGLIEST HOUSE OF THE YEAR marks – i.e., UGLIEST HOUSE – are identical. Simply replacing one descriptive prepositional phrase for another (i.e., "OF THE YEAR" and "IN AMERICA") does not distinguish the marks. *See S&P Glob. Inc. v. S&P Data LLC*, 619 F. Supp. 3d 445, 456 (D. Del. 2022) (finding S&P and S&P DATA similar where the junior user "merely appends a generic term to the more prominent" portion). To the contrary, because HomeVestors' franchisees operate

4

nationwide, consumers would readily associate the phrase "IN AMERICA" with HomeVestors and would likely be seen as a natural extension of HomeVestors' marks. PPFF ¶ 6. WBD commonly referred to the show internally by a short name, either "Ugliest House" or "Ugly House." PPFF ¶ 12.

Furthermore, because HomeVestors owns dozens of federal registrations featuring the words UGLIEST HOUSE, UGLY HOUSES, and UGLY, consumers are more likely to assume that another variant of the mark – UGLIEST HOUSE IN AMERICA – is associated with HomeVestors. *See* PPFF ¶ 7; *see also Century 21 Real Est. Corp.*, 970 F.2d at 876 (noting that Century 21's multiple registrations for CENTURY-formative marks "increase[s] the likelihood that consumers would misconstrue the source of insurance under the mark CENTURY LIFE OF AMERICA").

While it is apparent from even a plain viewing of the word marks that UGLIEST HOUSE is the dominant portion of both WBD's and HomeVestors' marks, both parties also emphasize UGLIEST HOUSE in their design marks, as shown below.

 

On the left is a logo that HomeVestors regularly uses to promote its home renovation contest. PPFF ¶ 9. On the right is WBD's "main title logo" that appears at the start of every episode, repeated at least from seasons 1 through 5, with only minor variations. *Id.* Both logos prominently feature "UGLIEST HOUSE" as the dominant portion of the mark, start with "THE," use a similar paintbrush font, and use similar background colors.

The on-screen promotions of UGLIEST HOUSE IN AMERICA also prominently featured "UGLIEST HOUSE" as the dominant portion of the mark, as shown below.

  

PPFF ¶ 10.

To the extent WBD argues that the addition of its house mark HGTV lessens the association between the two brands, that fact weighs in HomeVestors' favor in a reverse confusion analysis. *See A & H Sportswear, Inc.*, 237 F.3d at 229–30 ("[I]n the reverse confusion context, the presence of housemarks or disclaimers must obviously be treated differently than in the direct confusion context."). The addition of the "junior user's house mark can aggravate reverse confusion by reinforcing the association of the trademark exclusively with the junior user to the detriment of the smaller senior user." *Freedom Card, Inc.*, 432 F.3d at 475–76.

Finally, courts "cannot ignore the propensity of consumers to often shorten trademarks" when considering the similarity of the marks. *Big M. Inc. v. U.S. Shoe Corp.*, 228 U.S.P.Q. 614 (T.T.A.B. Dec. 13, 1985). WBD producers frequently referred to the show by the shorthand UGLIEST HOUSE. PPFF ¶ 12. WBD's head of marketing Cory Chapman confirmed that #UgliestHouse was the official hashtag used to promote the show, including on the HGTV website and on Facebook and Instagram. PPFF ¶ 13. And as part of a promotion for the first season, WBD directed viewers to enter to win a contest at the web page HGTV.COM/UGLY, prominently featuring the word "UGLY." PPFF ¶ 14. Thus, the evidence shows that consumers often encounter the words UGLY and UGLIEST HOUSE in isolation in connection with the WBD television series, which establishes these elements as the dominant portion of WBD's mark.

2. *Strength of the Marks*

In a typical forward confusion analysis, this second *Lapp* factor examines "(1) the inherent features of the [plaintiff's] mark contributing to its distinctiveness or conceptual strength and (2) the factual evidence of the mark's commercial strength or of marketplace recognition of the mark." *Sabinsa Corp. v. Creative Compounds, LLC*, 609 F.3d 175, 184-85 (3d Cir. 2010). But in reverse confusion, "it is the strength of the larger, junior user's mark which results in reverse confusion." *A & H Sportswear, Inc.*, 237 F.3d at 231 (citation omitted).

Considering, first, the conceptual strength of the mark, in both forward and reverse confusion, "a strong mark should weigh in favor of a senior user." *Id.* Conceptual strength is measured along a spectrum, from generic (weak, or low distinctiveness) to arbitrary or fanciful (strong, or high distinctiveness). *See S&P Glob. Inc.*, 619 F. Supp. 3d at 457. A descriptive mark is one that immediately identifies to the consumer the product or service offered under the mark. *See A & H Sportswear, Inc.*, 237 F.3d at 222 (citation omitted). A suggestive mark, on the other hand, "require[s] consumer 'imagination, thought, or perception' to determine what the product is" based on the name. *Id.* at 221–22. A suggestive mark is stronger than a descriptive mark.

HomeVestors' THE UGLIEST HOUSE OF THE YEAR marks and WBD's UGLIEST HOUSE IN AMERICA mark are suggestive because they do not immediately identify the goods or services offered under the mark. One refers to a reality television series featuring unique houses in which one homeowner will receive a free a home renovation, and the other to a contest for franchisees to showcase their most impressive home renovations. PPFF ¶ 15. None of the marks describe those services.

Evidence demonstrated at trial that the television show UGLIEST HOUSE IN AMERICA is a misnomer and therefore not descriptive. As Ms. Scheer testified, "ugly is so suggestive." PPFF ¶ 16. WBD witnesses testified that they intentionally avoided casting objectively "ugly" houses

and instead sought wacky, tacky, or outdated homes. *Id.* They discarded homes that were too "ugly." *Id.* So, too, is THE UGLIEST HOUSE OF THE YEAR a misnomer because it celebrates the most beautiful transformation of a home, not the "ugliest." PPFF ¶ 17. Thus, both marks are suggestive and thus conceptually strong.

Additionally, the federal registrations for HomeVestors' WE BUY UGLY HOUSES and THE UGLIEST HOUSE OF THE YEAR marks are incontestable under 15 U.S.C. § 1065, which shows the strength of the marks. *See* PPFF ¶ 18; *U.S. Jaycees v. Philadelphia Jaycees*, 639 F.2d 134, 137 n.3 (3d Cir. 1981) ("[I]ncontestability does bear on the strength of a mark … ."); *Alliance for Good Gov't v. Coal. for Better Gov't*, 901 F.3d 498, 510 n.14 (5th Cir. 2018) ("Incontestability … preclude[s] an infringement action from being defended on the grounds that the mark is merely descriptive [and] shows strength of the mark.'" (cleaned up)).

For reverse confusion, "a court should analyze the 'commercial strength' factor in terms of (1) the commercial strength of the junior user as compared to the senior user; and (2) any advertising or marketing campaign by the junior user that has resulted in a saturation in the public awareness of the junior user's mark." *A & H Sportswear, Inc.*, 237 F.3d at 231 (citation omitted). In other words, a greater advertising campaign by WBD of the UGLIEST HOUSE IN AMERICA is more likely to result in reverse confusion.

WBD's advertising saturation for the UGLIEST HOUSE IN AMERICA far exceeds HomeVestors' advertising campaign for THE UGLIEST HOUSE OF THE YEAR. On the one hand, WBD is a massive media conglomerate with widespread reach and unfettered access to airtime. WBD promoted UGLIEST HOUSE IN AMERICA on its own owned and operated television networks – advertising that WBD alleged at trial to have a value of more than $19 million for just the first five seasons. PPFF ¶ 19. In addition, WBD claims to have spent nearly $1

8

million on "direct media" in 2022 and 2023, which is money actually paid by WBD to an external third party to promote the show. *See id.*

In contrast, while HomeVestors has spent hundreds of millions of dollars advertising its WE BUY UGLY HOUSES marks, it only spent about $12,000 over the past four years advertising THE UGLIEST HOUSE OF THE YEAR contest. PPFF ¶ 20. HomeVestors has never aired television commercials to promote THE UGLIEST HOUSE OF THE YEAR nor paid to advertise the contest outside of social media. *Id.* Thus, the UGLIEST HOUSE IN AMERICA mark received far greater advertising and promotion, reaching homes nationwide on major television networks and via WBD's social media accounts, as compared with HomeVestors' limited advertising for THE UGLIEST HOUSE OF THE YEAR contest.

WBD did not present evidence or testimony that there have been any third parties using any marks that are similar to HomeVestors' THE UGLIEST HOUSE OF THE YEAR marks. Thus, this factor favors HomeVestors, particularly in a reverse confusion analysis.

3. *Care and Attention Expected of Consumers When Making a Purchase.*

Under the third factor, courts consider the costs of the products or services and care and sophistication of the consumers engaging in the purchasing. "If there is evidence that both average consumers and specialized commercial purchasers buy goods, there is a lower standard of care because of the lack of sophistication of some of the relevant purchasers." *Checkpoint Sys., Inc. v. Check Point Software Techs., Inc.*, 269 F.3d 270, 285 (3d. Cir. 2001).

There is no cost to participate in the services offered under THE UGLIEST HOUSE OF THE YEAR mark, that is, for franchisees to send photos of their home transformations or for social media users to "vote" for a winner by liking and commenting on the social media posts. PPFF ¶ 21. For the services offered under the WE BUY UGLY HOUSES marks, there is also no cost for a homeowner to call HomeVestors and speak to one of its franchisees to get an offer. Even if

a homeowner decides to sell their house to HomeVestors, there is no cost to the homeowner; rather, the homeowner gets the proceeds of the sale. PPFF ¶ 22. Likewise, there is no cost for these same homeowners to apply to become contestants on WBD's televised home renovation contest or to appear on the show for a chance to win a home renovation. PPFF ¶ 23.

Homeowners are not professional purchasers or necessarily sophisticated in real estate or home renovation. To the contrary, most homeowners who reach out to HomeVestors and HGTV are likely doing so because they do not have the means or tools to renovate their dated and quirky homes themselves and they are looking for an easy solution. PPFF ¶ 24. Because of the ease of contacting and interacting with both parties from homeowners across the United States, initial interest confusion is likely. This factor therefore weighs in HomeVestors' favor.

### 4. *Length of Time Defendant Has Used the Mark Without Evidence of Actual Confusion.*

WBD first aired the show *Ugliest House in America* on January 1, 2022, and within a matter of months, Google search results were already displaying hits for the Ugliest House in America when "Ugliest House of the Year" was searched. PPFF ¶ 25. And franchisee Robert Sturrock testified that he received calls from franchisees asking if HomeVestors was affiliated with the show. PPFF ¶ 26. Therefore, shortly after the show aired, indicia of confusion began to arise, leaning this factor in HomeVestors' favor.

### 5. *Intent of the Defendant in Adopting the Mark.*

Evidence of intent is not a prerequisite to finding a likelihood of confusion, but such evidence "weighs heavily in favor of finding a likelihood of confusion." *Sabinsa*, 609 F.3d at 187. For reverse confusion, the intent inquiry must "focus on whether the defendant was aware of the senior user's use of the mark in question, or whether the defendant conducted an adequate name

search for other companies marketing similar goods or services under that mark." *Com. Nat. Ins. Servs., Inc.*, 214 F.3d at 444.

The Court must consider "[t]he adequacy and care with which a defendant investigates and evaluates its proposed mark, and its knowledge of similar marks." *Kos Pharms.*, 369 F.3d at 721. There is no doubt that WBD investigated registrations of similar marks and was alerted to HomeVestors' marks when it adopted the title for the show. WBD requested and received a trademark search for the proposed title of the show, dated November 19, 2020. PPFF ¶ 27. The search report revealed numerous HomeVestors' marks, including THE UGLIEST HOUSE OF THE YEAR and WE BUY UGLY HOUSES, as similar marks found by searching the U.S. Patent & Trademark Office records. *Id.*

HomeVestors further established at trial that WBD not only knew about HomeVestors' marks but reached out to potentially collaborate with HomeVestors to generate leads for the show. Specifically, the show's production company and WBD's agent, Big Fish Entertainment, reached out to HomeVestors' marketing team in June 2020 indicating they were looking for "a potential collaboration." PPFF ¶ 28. The head of casting for Big Fish had a meeting with HomeVestors head of marketing Charlie Calise to discuss "a potential collaboration between Imaginuity (marketing agency for HomeVestors/We Buy Ugly Houses®) and Big Fish Entertainment to spread our casting outreach for the ugliest houses in America, which is HomeVestor's [sic] specialty." *Id.* Thus, at the start of casting, Big Fish called to mind an association between HomeVestors and the show and sought to utilize HomeVestors' vast network to aid it in casting.[2] Through those

---

[2] As the agent of WBD, the acts of Big Fish are imputed to WBD. *See* Restatement Third Agency § 5.03; *Belmont v. MB Inv. Partners, Inc.*, 708 F.3d 470, 494 (3d Cir. 2013) ("[T]he imputation doctrine recognizes that principals generally are responsible for the acts of agents committed within the scope of their authority.").

discussions, Big Fish learned that HomeVestors had its own home renovation contest called THE UGLIEST HOUSE OF THE YEAR. *Id.*

*Ugliest House in America* was different from any other show HGTV had done, and it needed help to cast outside its normal avenues. As the producer of Ugliest House in America said, "we normally just show pretty houses" on HGTV. PPFF ¶ 29. Casting "ugly" houses required a different strategy. For that, WBD turned to HomeVestors, because finding "the ugliest house in America" is "HomeVestor's [sic] specialty." *Id.*; PPFF ¶ 28. After terminating discussions with HomeVestors, WBD continued to emphasize the words "ugly" and "ugliest" to generate leads for its show. *Id.* Even though multiple WBD employees said they wanted quirky – not ugly – homes, WBD producer Jodi Scheer indicated it was important to emphasis the word "ugly" in the casting headline, suggesting WBD wanted to maintain an association with HomeVestors to attract leads. PPFF ¶ 29.

WBD continued using the infringing title even after receiving two cease-and-desist letters from HomeVestors just weeks after the series first aired, which is also relevant to intent. PPFF ¶ 30. "[A]ll post-notification conduct must be analyzed to determine if the defendant's continuing actions were unreasonable and amounted to bad faith." *Lontex Corp. v. Nike, Inc.*, 107 F.4th 139, 152 (3d Cir. 2024) (quoting *Moore Bus. Forms, Inc. v. Ryu*, 960 F.2d 486, 492 (5th Cir. 1992)). WBD also renewed the show for an additional five seasons during the pendency of this lawsuit. PPFF ¶ 31. Thus, WBD's continued use of the title and similar marks after having notice of HomeVestors and its THE UGLIEST HOUSE OF THE YEAR marks must be considered, as well as the fact that WBD made no changes to its program title, logos, or marketing campaigns after being put on notice of HomeVestors' trademarks and this suit.

6.  *Evidence of Actual Confusion.*

Because "[e]vidence of actual confusion is frequently difficult to find, . . . actual confusion is not necessary to demonstrate a likelihood of [confusion]." *Sabinsa*, 609 F.3d at 187. HomeVestors presented evidence at trial of actual confusion. Robert Sturrock—a development agent and franchisee—testified that multiple franchisees asked him if HomeVestors is involved with the show. PPFF ¶ 32. HomeVestors also presented evidence demonstrating indicators of actual confusion via a Facebook AI interaction.  In a Facebook post on the HomeVestors' WE BUY UGLY HOUSES account announcing the winner of THE UGLIEST HOUSE OF THE YEAR contest, an AI prompt at the bottom of the post asked the user if it wanted to learn about the contest rules. PPFF ¶ 33. When the prompt is clicked, instead of returning information about HomeVestors' contest, Facebook's AI returned information about HGTV's show, demonstrating that Facebook's AI confused the two contests. *Id.* And Google search results have started returning results for "Ugliest House in America" when searching for "The Ugliest House of the Year" since HGTV began airing *Ugliest House in America*. For example, in 2022, the same year the *Ugliest House in America* first aired, a Google search result for "the ugliest house of the year" produced a HomeVestors website as the top result but then immediately provided results for the HGTV show *Ugliest House in America*. PPFF ¶ 34. Google even offered additional suggested searches that relate to WBD's show, such as "Is Ugliest House in America coming back?" and "What day is Ugliest House in America on?" *Id.* Each of these examples provides indicia of actual confusion that weighs in favor of HomeVestors.

7.  <u>Whether the Services Are Marketed Through the Same Channels of Trade and Advertised Through the Same Media.</u>

HomeVestors and WBD have overlapping channels of trade and advertise through the same media. HomeVestors' THE UGLIEST HOUSE OF THE YEAR mark is advertised and promoted primarily on Facebook and Instagram. PPFF ¶ 35. WBD advertises UGLIEST HOUSE IN

AMERICA on social media. PPFF ¶ 36. Homeowners who wish to be on the show *Ugliest House in America* are encouraged sign up online. *Id.* And 52 percent of all HomeVestors' leads come from online advertising, primarily through paid search, such as paying Google or Bing to have HomeVestors' links appear at the top of the search results. *Id.* Despite the more than $63 million that HomeVestors has paid to have its links prominently appear in search results between 2020 and 2024, *id.*, links to the HGTV show *Ugliest House in America* are saturating the Google search results when HomeVestors' marks are searched. PPFF ¶ 37.

Moreover, when users are scrolling through their social media feeds, they are likely to encounter HomeVestors' THE UGLIEST HOUSE OF THE YEAR marks at the same time they see posts for UGLIEST HOUSE IN AMERICA, using the hashtag #ugliesthouse, which is comprised of the overlapping dominant portion of both marks. PPFF ¶ 38. Thus, users are likely to encounter HomeVestors and WBD's marks when Google searching or scrolling through social media feeds, illustrating the overlapping trade and marketing channels.

   8.   *The Extent to Which the Targets of the Parties' Sales Efforts Are the Same.*

HomeVestors' and WBD's sales efforts both target homeowners, nationwide. PPFF ¶ 39. HomeVestors targets adults 35 and older. *Id.* HGTV targets adults 25-54. *Id.*

More specifically, both parties target homeowners with quirky or dated homes that are not retail-ready. PPFF ¶ 40. As HomeVestors franchisee and development agent Robert Sturrock testified, most of the houses that he, and the franchisees he advises, consider buying are houses that are dated, have odd layouts, obsolete floor plans, and dated wallpaper and cabinet choices. PPFF ¶ 40. These are the same types of houses that WBD seeks out for casting. *Id.*

The homeowners who have appeared on the HGTV show are located in the same cities and small towns where HomeVestors franchisees operate and obtain leads. For example, winners of the show *Ugliest House in America* (each of whom won a free home renovation), were located in

14

Soddy Daisy, Tennessee; Upper Darby, Pennsylvania; and Manassas, Virginia, to name a few. PPFF ¶ 41. HomeVestors, which tracks leads in a database, found that 28 homeowners in Soddy Daisy, 156 homeowners in Upper Darby, and 198 homeowners in Manassas had previously reached out to HomeVestors' franchisees about potentially selling their homes. *Id.* In other words, HomeVestors and WBD are competing for leads in the same neighborhoods. At least one homeowner reached out to both WBD and HomeVestors to either sell their house or appear on the show to try to win a free renovation. PPFF ¶ 42.

While WBD has argued that homeowners appearing on the show do not want to sell their homes, the evidence does not support that position. The winner of the first season of *Ugliest House in America* sold their home shortly after obtaining the free renovation. PPFF ¶ 43. Another home that appeared on the show in January 2022 was listed for sale in September 2020 and then was taken off the market in January 2021 – around the time when the homeowner would have been applying and preparing to be on the show. PPFF ¶ 44. In other words, the homeowner tried to sell the house but took it off the market when she had the opportunity to appear on the show and potentially win a free renovation.

In Mr. Sturrock's experience, homeowners who have "ugly" or dated homes typically are more interested in selling their homes than homeowners without these issues because having to renovate a house can be overwhelming. PPFF ¶ 45. HomeVestors offers a "quick, simple, easy" solution to homeowners with homes in need of renovation, which are the same homes that are targeted by WBD to appear on the show. *Id.* Because the targets of each party's sales efforts are the same, this factor favors HomeVestors.

   9.   *Relationship of the Services in the Minds of the Consumers.*

Under the ninth *Lapp* factor, "courts examine whether buyers and users of each parties' goods are likely to encounter the goods of the other, creating an assumption of common source affiliation or sponsorship." *Checkpoint Sys., Inc.*, 269 F.3d at 286.

HomeVestors' THE UGLIEST HOUSE OF THE YEAR mark is intended to celebrate franchisee's home renovations and promote HomeVestors and the WE BUY UGLY HOUSES brand. PPFF ¶ 47.  HGTV, too, "focuses on all things home and the celebration of home renovation." *Id.* Even more specifically, THE UGLIEST HOUSE OF THE YEAR is a contest featuring home transformations of once "ugly" or dated houses, and the show UGLIEST HOUSE IN AMERICA is a contest featuring a home transformation of a once "ugly" or dated house. PPFF ¶ 48.

HGTV viewers are accustomed to seeing show titles reflective of partnerships with third-party brands. For example, the HGTV series *Zillow Gone Wild* features the well-known trademark ZILLOW. PPFF ¶ 49. WBD had to enter into a license agreement with Zillow to use its mark in the show title. *Id.* When brainstorming ideas for the show UGLIEST HOUSE IN AMERICA, the production team considered multiple brand collaborations and sponsorships with companies such as Zillow, NextDoor, Realtor.com, Kohler, and Sherwin-Williams. PPFF ¶ 50. HGTV is also almost exclusively reality television shows about residential real estate, featuring real homeowners. *Id.* The shows on HGTV are about real people involved in the residential real estate business. *Id.* So consumers are likely to believe that a name like UGLIEST HOUSE IN AMERICA could be sponsored or affiliated with the WE BUY UGLY HOUSES people or the company behind THE UGLIEST HOUSE OF THE YEAR marks.

HGTV has a branded line of paints with Sherwin-Williams, so consumers will encounter the HGTV mark on paint cans while browsing the aisles of a hardware store. PPFF ¶ 51.

HomeVestors, too, has partnership deals with Sherwin-Williams, as well as Lowe's (as does WBD, *id.*), The Home Depot, Moen, and Wayfair Professional. *Id.* Thus, WBD and HomeVestors partner with the same brands and evoke similar associations in the minds of consumers, particularly because both are focused on residential real estate.

Both WBD and HomeVestors offer a solution for homeowners with "ugly" or dated homes that are not retail ready. And while WBD provides, in part, entertainment services for viewers to watch a televised home renovation contest called UGLIEST HOUSE IN AMERICA, HomeVestors, too, offers the public the opportunity to view and vote on its home renovation contest called THE UGLIEST HOUSE OF THE YEAR. PPFF ¶ 52.

There is also overlap between WBD and HomeVestors in the entertainment space. HomeVestors franchisee Marco Icaza had one of the homes he built appear on the HGTV show *Selling the Big Easy*. PPFF ¶ 53. Icaza also met with an HGTV producer to discuss the possibility of Icaza starting his own HGTV show. *Id.* Additionally, his real estate agent has her own HGTV show. *Id.* The hosts on HGTV shows, for the most part, are real designers, real estate agents, and contractors – all of whom are in the same business as HomeVestors' franchisees. *Id.*

Consumers are therefore likely to believe WBD's UGLIEST HOUSE IN AMERICA show is sponsored by or affiliated with HomeVestors – or, in the case of reverse confusion, believe that HomeVestors is attempting to trade on the goodwill of WBD's show despite HomeVestors being the senior user. This factor therefore weighs in favor of HomeVestors.

10. *Other Facts.*

As the Court heard during trial, there are many other facts that show there is overlap between HomeVestors and WBD, such as the fact that a HomeVestors' franchisee was asked to be on HGTV, and how an HGTV host was infringing HomeVestors' trademarks – because hosts on HGTV are competing with HomeVestors' franchisees. PPFF ¶¶ 53, 65.

WBD is likely to rely heavily on surveys conducted and opinions offered by its expert Sarah Butler that there no likelihood of confusion. However, as HomeVestors' expert Dr. Bruce Isaacson explained, Ms. Butler cannot support her ultimate conclusions based on the surveys she conducted. Ms. Butler "never tests a scenario where a consumer encounters both marks at the same time," nor did she analyze the issue of proximity—where consumers encounter both marks together, such as on social media sites or Google. PPFF ¶ 55. As Dr. Isaacson testified, "an Eveready [survey] cannot be used to disprove confusion when there is proximity." *Id.* And evidence presented at trial showed that the marks appear in proximity, such as during Google and Bing search results and on social media platforms such as Facebook and Instagram. *Id.* And Dr. Isaacson testified that there is proximity in this case, as he confirmed using his own online searches. *Id*. Accordingly, Ms. Butler's ultimate opinions in this case are not supported by the Eveready surveys she conducted. *See GOLO, LLC v. Goli Nutrition Inc.*, No. 20-667-RGA, 2020 WL 5203601, at *11 (D. Del. Sept. 1, 2020) ("A survey can serve as circumstantial evidence of actual confusion, 'but only to the extent that the survey replicates the real world setting in which instances of actual confusion would occur.'") (citation omitted).

And, as Dr. Isaacson testified, "in an Eveready survey, if a consumer does not have in their mind an image or understanding or what we call an awareness of the thing that's not shown, then they can't ever measure confusion with regard to that." PPFF ¶ 56. WBD has not introduced record evidence that the relevant marks are well-known, and there is evidence in the record about the *lack* of consumer awareness of the marks Ms. Butler surveyed. *Id*. As Dr. Isaacson testified, Ms. Butler's survey "results could be due to low awareness." *Id*. Ms. Butler's surveys cannot support her opinion that there is no likelihood of confusion in this case between THE UGLIEST HOUSE OF THE YEAR marks and UGLIEST HOUSE IN AMERICA.

## II.    WBD'S USE OF THE TITLE UGLIEST HOUSE IN AMERICA CONSTITUTES DILUTION UNDER FEDERAL AND DELAWARE LAW.

To prove dilution under federal law, a plaintiff must show its mark is "famous," that defendant began making commercial use in interstate commerce of a mark after plaintiff's mark became famous, and that defendant's "use causes dilution by lessening the capacity of the plaintiff's mark to identify and distinguish goods or services." *Times Mirror Mags., Inc. v. Las Vegas Sports News, L.L.C.*, 212 F.3d 157, 163 (3d Cir. 2000).

The Delaware dilution claim has a lower threshold than its federal counterpart, as it requires only that plaintiff's mark be "distinctive," not famous. *See S&P Global Inc.*, 619 F. Supp. 3d at 469 (finding for plaintiff on its Delaware dilution claim but not for its federal claim); 6 *Del. C.* § 3313. "[S]ome mental association between the marks is necessary for a dilution claim." *Barnes Grp. Inc. v. Connell Ltd. P'ship*, 793 F. Supp. 1277, 1304 (D. Del. 1992). *However*, there need not be competition between the parties' goods and services or a likelihood of confusion between the two uses of the marks. *Id.*

For both federal and state dilution claims, courts may consider the following factors to determine whether a mental association is likely:

(i)    The degree of similarity between the mark or trade name and the famous [or distinctive] mark.

(ii)    The degree of inherent or acquired distinctiveness of the famous [or distinctive] mark.

(iii)    The extent to which the owner of the famous [or distinctive] mark is engaging in substantially exclusive use of the mark.

(iv)    The degree of recognition of the famous [or distinctive] mark.

(v)    Whether the user of the mark or trade name intended to create an association with the famous [or distinctive] mark.

(vi)    Any actual association between the mark or trade name and the famous [or distinctive] mark.

*S&P Glob. Inc.*, 619 F. Supp. 3d at 468.

### A.    HomeVestors' WE BUY UGLY HOUSES Marks Are Famous.

HomeVestors has been using the WE BUY UGLY HOUSES marks since at least 2000. PPFF ¶ 59. More than 95 percent of the nearly $640 million of advertising spent between 2013 and Q1 2024 went toward supporting the WE BUY UGLY HOUSES marks. *Id.* HomeVestors has sent more than 500 million pieces of direct mail to consumers' houses. *Id.* The marks appear on billboards throughout the country, which have been seen by consumers roughly 1.8 billion times over just the past five years. *Id.* Advertisements for WE BUY UGLY HOUSES have been seen on television by consumers roughly 1.2 billion times. *Id.* HomeVestors' direct mail, billboards, television advertising, and online advertising is nationwide. *Id.* Online, HomeVestors' advertisements have generated nearly 2.2 billion impressions – that is, times that an advertisement was seen by a person – on Facebook, Instagram, YouTube, Google, Bing, and various websites using Trade Desk. *Id.* HomeVestors has spent over $63 million between 2020 and Q1 2024 on "paid search," that is, paying search engines like Google to have a company's links appear in the top two or three positions. *Id.*

This monumental advertising campaign has generated nearly 1.7 million leads, or homeowners who have reached out to HomeVestors' franchisees about potentially selling their homes, just between the years 2012 to 2021. PPFF ¶ 60. And as a result of those leads, HomeVestors' franchisees purchased more than 100,000 houses between 2012 and August 2024, valued at a total of $12 billion. *Id.*

The WE BUY UGLY HOUSES marks have gained widespread nationwide recognition to the point that HomeVestors' franchisees are known as "the WE BUY UGLY HOUSES people." PPFF ¶ 61. Oftentimes people do not recognize the name "HomeVestors," but when a franchisee says WE BUY UGLY HOUSES, there is often instant recognition. *See id.* In addition, HomeVestors works to gain dozens of "earned media" placements a year – that is, independent

20

newspaper and magazine articles about HomeVestors, featuring its marks. *Id.* Through decades of use, hundreds of millions of dollars of advertising spending, and billions of impressions, HomeVestors' WE BUY UGLY HOUSES marks have become famous nationwide.

**B.   HomeVestors' WE BUY UGLY HOUSES Marks Are Distinctive.**

HomeVestors' WE BUY UGLY HOUSES marks are distinctive, at a minimum, for the reasons stated above. In addition, incontestable, federally registered trademarks – like WE BUY UGLY HOUSES – "are presumptively distinctive." *See* PPFF ¶ 18; *UHS of Del., Inc. v. United Health Servs., Inc.*, 227 F. Supp. 3d 381, 393 (M.D. Pa. 2016). It is only where a mark is *not* incontestable that a plaintiff must prove the mark is either inherently distinctive or has acquired secondary meaning through length and exclusivity of use and other factors. *See Ford Motor Co. v. Summit Motor Prods., Inc.*, 930 F.2d 277, 291-92 (3d Cir. 1991). Thus, HomeVestors' WE BUY UGLY HOUSES marks are distinctive.

**C.   WBD Is Likely to Cause Dilution of the WE BUY UGLY HOUSES Marks.**

WBD's use of the series title UGLIEST HOUSE IN AMERICA beginning in 2022 has caused dilution of HomeVestors' WE BUY UGLY HOUSES marks "by lessening the capacity of the plaintiff's mark to identify and distinguish goods or services." *Times Mirror Mags.*, 212 F.3d at 163.

The factors identified above favor a finding that consumers are likely to have a mental association between UGLIEST HOUSE IN AMERICA and HomeVestors' famous and distinctive WE BUY UGLY HOUSES marks. *S&P Glob. Inc.*, 619 F. Supp. 3d at 468 (identifying factors). To begin, the similarity of the marks is heightened particularly given WBD's tendency to shorten the show title to #UgliestHouse on its website and in social media and emphasize the words UGLIEST HOUSE in promotions for the show. PPFF ¶ 64. And given HomeVestors' portfolio of UGLY, UGLY HOUSE, and UGLIEST HOUSE-formative marks, association with any UGLY

HOUSE or UGLIEST HOUSE mark is likely to spark an association in the mind of the consumer. *Id.*

Second, for all the reasons discussed in the preceding section, the WE BUY UGLY HOUSES marks are distinctive, both through extensive, nationwide marketing campaigns and their incontestable registration status.

Third, HomeVestors is the exclusive user of the WE BUY UGLY HOUSES mark. HomeVestors takes great pains to enforce its marks and considers brand enforcement vital to ensuring its franchisees are part of a recognizable brand that generates leads. PPFF ¶ 65. As one example, HomeVestors has succeeded previously in convincing HGTV host Tarek El Moussa to stop using the mark I BUY UGLY HOUSES on his social media pages and to take down his website www.sellmyuglyhome.com. *Id.* Through extensive enforcement and a robust advertising campaign, HomeVestors has managed to remain the exclusive user of the WE BUY UGLY HOUSES marks.

Fourth, as indicated previously, HomeVestors is widely recognized as the WE BUY UGLY HOUSES people. PPFF ¶ 66. People tend to recognize the name WE BUY UGLY HOUSES even when they have not heard of HomeVestors. *Id.* Even WBD producer Jodi Scheer testified that she had heard of WE BUY UGLY HOUSES prior to this litigation, recalling that she had seen the signs "throughout my life." *Id.*

Fifth, as discussed in the "intent" section above, WBD immediately associated a search for "ugly houses" with HomeVestors' WE BUY UGLY HOUSES brand. PPFF ¶ 67. WBD's agent, Big Fish, reached out to HomeVestors about a potential collaboration for the show. PPFF ¶ 28. Big Fish wanted to tap into "HomeVestors' specialty" to recruit homeowners with "ugly" houses to apply to be on the HGTV show. *Id.* And WBD obtained a trademark search report prior to

22

selecting the title of the show that referenced HomeVestors' WE BUY UGLY HOUSES and THE UGLIEST HOUSE OF THE YEAR marks. PPFF ¶ 27. Thus, WBD knew of HomeVestors' marks and intended to create an association with HomeVestors to generate leads and viewers for the show.

Finally, there has been actual association between UGLIEST HOUSE OF THE YEAR and WE BUY UGLY HOUSES, as demonstrated through Google searches and AI prompts on social media. For example, on the WE BUY UGLY HOUSES Facebook page, an AI prompt provides the user with information about HGTV contests. PPFF ¶ 68.

HomeVestors has worked hard and spent hundreds of millions of dollars to ensure it is the exclusive user of the WE BUY UGLY HOUSES mark, and WBD's injection of UGLIEST HOUSE IN AMERICA into the marketplace is likely to cause dilution by blurring of HomeVestors' marks under both federal and Delaware law.

## III.    WBD CANNOT MEET ITS BURDEN TO ESTABLISH ANY OF ITS AFFIRMATIVE DEFENSES.

The following affirmative defenses remained for disposition at trial: First Amendment, *Rogers v. Grimaldi* doctrine, and fair use. D.I. 281. WBD's First Amendment and *Rogers* defenses can be resolved together "because *Rogers* interprets the First Amendment." D.I. 281 at n.4. And WBD's *Rogers* and fair use defenses fail for the same reason – WBD uses the title of its show, at least in part, as a trademark, which is source-identifying. D.I. 281 at 5-8. Because these are affirmative defenses, WBD bears the burden of proving that it does not use the title as a trademark.

As shown at trial, WBD cannot meet that burden. WBD uses titles of its shows on HGTV as trademarks, including the following, each of which is registered with the USPTO: FLIP OR FLOP (Reg. No. 4822237), HOUSE HUNTERS (Reg. No. 3452934), LOVE IT OR LIST IT (Reg. No. 4777880), and ROCK THE BLOCK (Reg. No. 6222967). PPFF ¶ 70. HGTV uses its show

titles that are registered trademarks like ROCK THE BLOCK in channel listings, promotional materials, and as a hashtag on social media sites. PPFF ¶ 71. Importantly, Ms. Scheer was asked "Can you think of any differences from how HGTV uses the name Rock the Block to how HGTV uses the name Ugliest House in America?" and answered "Personally, I think it's pretty -- like, all of our show titles are pretty much used in the same way to me." *Id.* In other words, WBD uses the title UGLIEST HOUSE IN AMERICA in the same manner that it uses show titles on HGTV that are registered trademarks.

Further, contracts with the show's host and production company specify that the title of *this* show – UGLIEST HOUSE IN AMERICA – is a trademark owned by WBD or its predecessor. PPFF ¶ 72.

Because these affirmative defenses are not available to defendants that claim and use a title as a trademark (i.e., in a source-identifying manner), WBD cannot rely on them to avoid liability in this case.

## IV. HOMEVESTORS IS ENTITLED TO A PERMANENT INJUNCTION AGAINST WBD'S USE OF THE TITLE UGLIEST HOUSE IN AMERICA.

To obtain a permanent injunction, "a plaintiff must show: '(1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction.'" *B. Braun Melsungen AG v. Terumo Med. Corp.*, 778 F. Supp. 2d 506, 513 (D. Del. 2011) (citation omitted).

"Once a trademark owner demonstrates likelihood of confusion, it is entitled to injunctive relief." *Lapp*, 721 F.2d at 462; *see* Trademark Modernization Act, 15 U.S.C. § 1116(a) (amending 15 U.S.C. § 1116(a) to add the following: "A plaintiff seeking any such injunction shall be entitled

24

to a rebuttable presumption of irreparable harm upon a finding of a violation identified in this subsection in the case of a motion for a permanent injunction . . . .").

Thus, under the first factor, it is presumed that HomeVestors will suffer irreparable injury. This presumption is bolstered by the fact that HomeVestors cannot quantify its damages given the nature of the infringement and has no other available remedy. Second, as discussed in the section below regarding disgorgement, there are no other adequate remedies to compensate HomeVestors. Third, HomeVestors would suffer the hardship of having its marks continue to be diluted while increasing the likelihood of confusion in the marketplace. PPFF ¶ 75. Regarding the hardship to WBD, WBD has already created a spinoff show with identical elements but under a different title– *Scariest House in America*. It can do so again, if it so chooses. Fourth, "[t]he public interest concern in trademark infringement cases is 'the interest in the prevention of confusion,'" so if a likelihood of confusion has been proven, then "it follows that if such use continues, the public interest would be damaged." *Maya Swimwear, Corp. v. Maya Swimwear, LLC*, 789 F. Supp. 2d 506, 517 (D. Del. 2011) (citations omitted). That same public interest would be served here with an injunction.

HomeVestors requests that the Court enter an injunction that prohibits WBD from using the title UGLIEST HOUSE IN AMERICA or any other confusingly similar mark, and order WBD to remove all references to UGLIEST HOUSE IN AMERICA on its website and social media pages, to no longer air any reruns of past shows, and to withdraw all past seasons as available content on streaming services.

## V.     HOMEVESTORS IS ENTITLED TO DISGORGEMENT OF WBD'S PROFITS ATTRIBUTABLE TO THE SHOW UGLIEST HOUSE IN AMERICA.

### A.     Equitable Considerations Favor Disgorgement.

To "evaluate whether equity supports disgorging the infringer's profits," [courts must] consider "(1) whether the infringer had the intent to confuse or deceive, (2) whether sales have been diverted, (3) the adequacy of other remedies, (4) any unreasonable delay by the plaintiff in asserting his rights, (5) the public interest in making the misconduct unprofitable, and (6) whether it is a case of palming off." *Kars 4 Kids Inc. v. Am. Can!,* 8 F.4th 209, 223 (3d Cir. 2021) (quoting *Banjo Buddies, Inc. v. Renosky*, 399 F.3d 168, 175 (3d Cir. 2005) (cleaned up)).

The first factor, intent, requires the same analysis as the intent factor in the likelihood of confusion analysis and dilution analysis. For the reasons stated in Section I.A.5, *supra*., this factor favors HomeVestors. With respect to the second factor, the evidence suggests leads have been or are likely to be diverted away from HomeVestors to WBD. *See* Section I.A.8, *supra*. Additionally, since WBD began airing *Ugliest House in America*, HomeVestors' Google search results have been supplanted by HGTV content. *See* Section I.A.7, *supra*.

For the third factor, there is no other adequate remedy for HomeVestors other than disgorgement of profits for WBD's past infringement and dilution, and an injunction to prevent future infringement and dilution. HomeVestors' harms are unquantifiable. HomeVestors cannot know or quantify the leads it lost or the dilutive effect of its marks in Google searches and resulting confusion in the marketplace. *See Banjo Buddies, Inc. v. Renosky*, 399 F.3d 168, 176 (3d Cir. 2005) (noting that, in cases where actual damages are speculative, the plaintiff "will be wholly uncompensated for [the defendant's] infringing actions" if profits are not assessed).

Fourth, HomeVestors did not delay in asserting its rights. To the contrary, HomeVestors first discovered that WBD moved forward with a show titled UGLIEST HOUSE IN AMERICA when it aired on January 1, 2022. PPFF ¶ 81. Just two-and-a-half weeks later, HomeVestors sent a cease-and-desist letter to WBD. *Id.* WBD and HomeVestors exchanged letters through March

2022. *Id.* HomeVestors thereafter prepared and filed suit in December 2022, less than a year after first discovering WBD's use of its mark and realizing that WBD was not going to stop at just one season of the show. *Id.*

Fifth, the public interest in making the misconduct unprofitable weighs in HomeVestors' favor. WBD knew it was using a mark that was confusingly similar to HomeVestors' marks, considered a collaboration with HomeVestors, and then chose to continue using the confusingly similar mark without permission from HomeVestors. Such misconduct should not be rewarded.

Sixth, while WBD's use of the title UGLIEST HOUSE IN AMERICA is likely to cause confusion as to source and affiliation of its services, this is not a traditional palming off case. It is worth noting that this sixth "palming off" factor does not apply to false advertising claims. *SurgiQuest v. Lexion Med., Inc.*, No. 14-382-GMS, 2018 WL 2247216, at *9 n.16 (D. Del. May 16, 2018). "Palming off" also should not apply to dilution claims, which do not require competition or likelihood of confusion as to the source of the marks. *See Barnes Grp.*, 793 F. Supp. at 1304. As the majority of the factors above favor HomeVestors, this Court should award disgorgement of profits to HomeVestors.

## B.    HomeVestors Met Its Burden in Proving WBD's Revenue.

When seeking to disgorge profits, "the plaintiff shall be required to prove defendant's sales only; defendant must prove all elements of cost or deduction claimed." 15 U.S.C. § 1117(a).

HomeVestors' damages expert, Dana Trexler, employed a clear and reliable method for calculating revenue attributable to *Ugliest House in America*. It is the same method Ms. Trexler used in another case to determine revenue attributable to a television series, and the opposing party's expert in that case used this method. PPFF ¶ 83. And, importantly, it is the same method that WBD itself stated should be used in response to an interrogatory asking WBD to approximate and provide a methodology for determining revenue attributable to the show. *Id.*

27

Ms. Trexler first determined the total percentage of viewing hours that viewers watched *Ugliest House in America* as compared with the total viewing hours for all HGTV shows, based on Nielsen ratings data. PPFF ¶ 84. Ms. Trexler then multiplied that percentage by the total revenue for HGTV in the relevant time period. *Id.* The results of Ms. Trexler's calculations are shown below.

| | 2022 | 2023 | 2024 | Total |
|---|---|---|---|---|
| **Percentage Viewership** | 0.87% | 1% | 0.64% | |
| **HGTV Revenue (rounded)** | $1.26 billion | $1.066 billion | $919.7 million | |
| **Revenue Attributable to** *Ugliest House in America* | $10,899,530 | $10,643,647 | $5,905,978 | **$27,449,155** |

*Id.*

HomeVestors therefore met its burden to prove revenue attributable to the show *Ugliest House in America*, which was calculated to be $27,449,155 for Seasons 1 through 5, which aired from January 2022 through the first half of 2024.

### C.    WBD Failed to Meet Its Burden in Proving Costs and Apportionment.

HomeVestors bears the burden of proving only WBD's revenue; WBD bears the burden of proving "all elements of cost or deduction" as well as isolating "profits which are attributable to the use of the infringing mark," also known as apportionment. *See PNC Fin. Servs. Grp., Inc. v. Plaid Inc.*, No. 2:20-cv-1977, 2024 WL 3691607, at *12 (W.D. Pa. Aug. 7, 2024) (citing 15 U.S.C. § 1117(a)) (second citation omitted); *see also Leonard v. Stemtech Int'l Inc.*, 834 F.3d 376, 395 (3d Cir. 2016). WBD has failed to do so.

First, WBD undercounted revenues attributable to the show *Ugliest House in America*. HGTV's primary revenue sources are advertising, distribution, and content. WBD counted only advertising revenue in making its calculations in this case. PPFF ¶ 86. Distribution and content revenue come from the sale of HGTV content to cable companies like Comcast (distribution) or

streaming companies like Hulu (content). *Id*. But, as Ms. Trexler explained, *Ugliest House in America* is part of the content being sold to cable companies and streaming services, so the same viewership percentage of revenue should be applied to the total distribution and content sales to reflect the value provided by the show. *Id.* To take it to the extreme, if HGTV provided no television content, Comcast and Hulu wouldn't pay any money. *Id.* So it is reasonable to apportion a share of that revenue to each show.

Next, WBD overinflated its costs by including advertisements for the show that aired on WBD's owned and operated (O&O) channels but which did not actually cost WBD any money. PPFF ¶ 87. As Ms. Trexler explained, it is not appropriate according to GAAP accounting standards to include these non-cash, intra-company transactions on a balance sheet. *Id.*; *see also Blackman v. Hustler Mag., Inc.*, 620 F. Supp. 792, 802 (D.D.C. 1985), *aff'd in part, rev'd in part on other grounds*, 800 F.2d 1160 (D.C. Cir. 1986) (finding "the value of house ad space" could not be included in revenue calculations).

Ms. Trexler provided her own cost analysis, whereby she calculated the actual costs of making the show from project budget sheets (including *inter alia* talent fees, travel, fees paid to the production company) plus overages. PPFF ¶ 88. As a result of these calculations, Ms. Trexler calculated production costs of $14,122,709, plus $1,531,855 of selling, general, and administrative costs (SG&A), for a total profit of $11,794,591 for seasons 1 through 5 of *Ugliest House in America*. *Id.*

WBD also failed to propose a reasonable methodology for apportioning the percentage of profits attributable to the title. It was WBD's burden, which it failed to meet; therefore, all profits should be awarded to HomeVestors. *See Walgreen Co. v. PWNHealth, LLC*, No. CV 24-0356-RGA, 2025 WL 445349, at *6 (D. Del. Feb. 10, 2025) ("There may well be a windfall to the trade-

mark owner where it is impossible to isolate the profits which are attributable to the use of the infringing mark. But to hold otherwise would give the windfall to the wrongdoer." (quoting *Mishawaka Rubber & Woolen Mfg. Co. v. S.S. Kresge Co.*, 316 U.S. 203, 207 (1942)).

## CONCLUSION

For the foregoing reasons, HomeVestors respectfully requests that the Court find WBD liable for trademark infringement, unfair competition, and dilution, and award a disgorgement of profits and injunctive relief to HomeVestors.

*/s/ Kelly E. Farnan*

OF COUNSEL:

Justin S. Cohen
Justin.Cohen@hklaw.com
Dina W. McKenney
Dina.McKenney@hklaw.com
Morgan J. Delabar
Morgan.Delabar@hklaw.com
HOLLAND & KNIGHT LLP
One Arts Plaza
1722 Routh St., Suite 1500
Dallas, TX 75201
214-969-1700

Cynthia A. Gierhart
HOLLAND & KNIGHT LLP
Cindy.Gierhart@hklaw.com
800 17th Street NW, Suite 1100
Washington, DC 20006

Steven J. Fineman (#4025)
Kelly E. Farnan (#4395)
Christine D. Haynes (#4697)
Richards, Layton & Finger, P.A.
One Rodney Square
920 North King Street
Wilmington, DE 19801
(302) 651-7700
fineman@rlf.com
farnan@rlf.com
haynes@rlf.com

*Attorneys for Plaintiff HomeVestors of America, Inc.*

Dated:  October 8, 2025